# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Steven Paolucci, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 2075 C.D. 2015 |
| | : | Submitted: March 11, 2016 |
| Workers' Compensation Appeal | : | |
| Board (Exelon Generation | : | |
| Company, LLC), | : | |
| Respondent | : | |

BEFORE:   HONORABLE ROBERT SIMPSON, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE DAN PELLEGRINI, Senior Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION**
**BY JUDGE SIMPSON**[1]                    **FILED: September 16, 2016**

Steven Paolucci (Claimant) petitions for review of an order of the Workers' Compensation Appeal Board (Board) that modified a Workers' Compensation Judge's (WCJ) order granting his claim petition for work-related binaural hearing loss under Section 306(c)(8) of the Workers' Compensation Act (Act).[2]  Claimant contends the Board erred in modifying the WCJ's order awarding him benefits based on a 20.9% binaural hearing loss to an award based on an 11.3% binaural hearing loss.  For the reasons that follow, we vacate the Board's order and remand for further proceedings.

---

[1] This case was reassigned to the author on July 11, 2016.

[2] Act of June 2, 1915, P.L. 736, as amended, 77 P.S. §513(8).

Claimant began working for PECO, which is now a subsidiary of Exelon Generation Company, LLC. (Employer), in October 1971. Claimant retired in January 2012. In July 2011, Claimant filed a claim petition alleging he sustained a work-related hearing loss in both ears as a result of exposure to loud noise while in the course of his employment.

Before the WCJ, Claimant testified that between 1971 and 1991, he worked for Employer in power plants as a mechanics' helper and mechanic before working as a rigger for the pipe fitters and welders. He stated that in 1991, he began repairing turbines at different plants, working up to 10 to 12 hours per day. He worked as a part planner and worker from 2002 to 2008, and he retired in January 2012. Thereafter, he returned to work as a sub-contractor where he is not exposed to noise.

Claimant explained that the plants were usually running while he was working and it was very loud in the areas he worked. He testified the loudest noises emanated from the water feed pumps for the turbines. It was so loud that the workers shouted to communicate and he sometimes felt numb. Claimant experienced ringing in his ears at the end of the day, which subsided when he went home. However, it lasted longer and longer as he aged. The noise in the workplace was so loud Claimant told his bosses the noise "is killing us." WCJ Op., 1/29/14, Finding of Fact (F.F.) No. 2c.

Claimant explained that he began to use rubber and foam earplugs in the mid-1980s and that they were fairly accessible by the 1990s. He testified the

2

workers could still hear each other with earplugs in place when they talked loudly or screamed. He stated he had ringing in his ears by the time Employer made earplugs available.

Claimant testified he first began to notice hearing difficulties in the late 1980s and that he could not hear his co-workers. He began lip reading at work. He still has trouble hearing family members and he sets the volume on the television too high for the other people at his house. He has not seen any doctors for his hearing problems other than Dr. Steven Ladenheim (Claimant's Expert) and Dr. Lee Rowe (Employer's Expert) as part of these proceedings. Claimant mows his lawn occasionally. He listened to rock and roll music when he was younger, and his hearing loss did not worsen since his retirement.

Claimant presented the deposition testimony of his Expert, a board certified otolaryngologist. Claimant's Expert testified Claimant's ears, nose and throat were normal upon examination. He performed an audiogram that showed Claimant had bilateral mild to severe sensorineural hearing loss. He reviewed a 1977 baseline audiogram, which did not reveal a significant hearing loss, and an audiometric record.

Claimant's Expert explained that normal hearing is within 0 to 20 decibels and that Claimant's hearing is well below those boundaries. He testified that both bone and air conduction studies must be reviewed to determine whether noise exposure is the cause of a hearing loss. Claimant's Expert's audiometric testing was consistent with Claimant's record over the years and showed an 11.3%

loss. Claimant's Expert opined Claimant has permanent and irreversible sensorineural hearing loss based on his review of Claimant's history, his physical examination and his many years of treating patients with diseases of the ear. He believed Claimant's total and cumulative noise exposure at work contributed to and caused his bilateral sensorineural hearing loss.

Claimant's Expert reviewed Employer's Expert's report and stated he does not disagree with Employer's Expert's finding that Claimant suffers from a 20.9% hearing loss. He explained the difference in decibels between the 3 audiograms can be attributed to test-to-test variability, and that the 9% differential between his audiogram and Employer's Expert's is 6 decibels in each of the pertinent frequencies.[3]

---

[3] Claimant's Expert testified, in relevant part:

> Q. I'd like you to comment on [Employer's Expert's] findings and opinions and explain to the [WCJ] what you agree with or disagree with.
> A. Well, the first thing I agree with is he did a history, physical examination, and audiogram involving [Claimant]. His audiogram has different findings than mine in terms of the percentage of loss. However, again, the shape and configuration of the audiograms are consistent and the difference in loss can be attributed to test-to-test variability. That is not uncommon.
> Some of the things I disagree about –
> Q. Before we get there, he had a finding of 20.9 percent; is that correct?
> A. Yes.
> Q. And do you disagree with that conclusion?
>
> A. No, I do not disagree with the conclusion. As I mentioned, his audiogram is of the same configuration as the audiogram that was done in my office, and the difference in percent of hearing loss

**(Footnote continued on next page…)**

4

However, Claimant's Expert testified he disagreed with Employer's Expert's conclusion that Claimant's hearing loss is age-related and that noise exposure was a minimally contributing factor to the hearing loss. He opined there is no way to distinguish the percentage of hearing loss attributable to age,

---

**(continued…)**

> from all three audiograms may be attributed to what we refer to as test-to-test variability.
>
> Q. How much variability do you need in order to get that difference of a percentage?
>
> A. The difference in percentage is 9 percent. So you would need a difference of 6 decibels in each of the four pertinent frequencies. 6 decibels is an extremely small level of sound.
>
> * * *
>
> Q. You testified on direct that he had – when he had I guess his exit audiogram at the time he retired in 2011, they showed a hearing loss of about 13.1 percent?
>
> A. Yes.
>
> Q. By the time of your audiogram [in] 2012, you found a hearing loss of 11.3 percent?
>
> A. That's correct.
>
> Q. And that, I guess, is within the statistical differentiation of these exams?
>
> A. That's correct, yes.
>
> Q. You would agree with me that any hearing loss after he left [Employer] couldn't be related to noise exposure, correct?
>
> A. I would agree with that, yes.
>
> Q. And the only number that you can conclusively testify to with a reasonable degree of medical certainty is your own audiogram of 11.3 percent, correct?
>
> A. I can certainly attest to my audiogram within a reasonable degree of medical certainty. In reading [Employer's Expert's] report, he states that this was done by a certified audiologist, it was done within the boundaries of an approved booth, so I can certainly say that his audiogram was accurate.

Reproduced Record (R.R.) at 5a-6a, 7a-8a.

hypertension and hyperlipidemia, and that smoking did not significantly contribute to Claimant's hearing loss. Claimant's Expert further opined there is no evidence that childhood disease played any part in the hearing loss.

Claimant's Expert also disagreed with Employer's Expert's suggestion that Claimant's audiograms do not show a notch at 3,000, 4,000, or 6,000 decibels, meaning that the hearing is worse at those frequencies, and that notching disappears over time as hearing loss progresses in other frequencies. Claimant's Expert examined a 1986 audiogram showing a possible notch at 6,000 decibels in both ears, but 1987, 1988 and 1989 tests did not show notching. He agreed that Claimant's 2007 audiogram showed only a 2.5% hearing loss, and that a 2012 audiogram showed an 11.3% hearing loss. He also agreed that any hearing loss after Claimant left his employment would not be related to work noise exposure. Nevertheless, Claimant's Expert opined within a reasonable degree of medical certainty that Claimant's noise exposure while working for Employer was either a total cause of Claimant's hearing loss or a substantial contributing factor to the hearing loss.

Employer presented the deposition testimony of its Expert, a diplomat of the American Board of Otolaryngology. Employer's Expert testified that in conjunction with his physical examination of Claimant, he reviewed Claimant's medical records and audiometric testing. Employer's Expert stated a 1977 baseline audiogram showed evidence of mild high frequency sensorineural hearing loss in the left ear at 6,000 cycles per second, and that all other frequencies were normal in both ears. A 1987 audiogram showed mild high frequency hearing loss at 6,000

6

and 8,000 cycles per second in the right ear and moderate loss in the left ear at the same levels, and there was no evidence of a characteristic occupationally-induced hearing loss notch. Employer's Expert testified that a 1997 audiometric test showed further progression of hearing loss in the 6,000 and 8,000 frequencies with no evidence of notching, and Claimant's binaural hearing handicap remained at 0%. He stated that a 2007 audiometric test showed hearing loss in both ears in all frequencies except at 6,000 cycles per second in the left ear and 4,000 and 6,000 cycles per second in the right ear, and that Claimant's binaural hearing handicap was now 2.5%. Employer's Expert also stated that additional audiometric testing between 2007 and 2011 showed further progression of hearing loss in both ears at 6,000, which is consistent with age-related hearing loss or presbycusis.

Employer's Expert examined Claimant after his retirement in 2012 and had audiometric testing performed, which showed bilateral moderate low frequency sensory hearing loss that dropped to severe high frequency hearing loss. He stated that Claimant's binaural hearing handicap was 20.9% under the American Medical Association (AMA) Guidelines which represented a significant increase from prior testing at 13.1%.[4] He explained that this was significant

---

[4] Specifically, Employer's Expert testified in relevant part:

> I performed a physical examination which included his ears, and this was entirely within normal limits. There was no evidence of any scar tissue, wax obstruction.
> I then had audiometric testing performed by a board certified audiologist under my direction which was in a sound dampened and calibrated booth pursuant to OSHA and ANSI specifications.
> Q.   What did you find as a result of that audiometric testing?

**(Footnote continued on next page…)**

7

because hearing loss does not continue to worsen after removal from the noise environment. Employer's Expert opined it was highly unlikely that any of the 20.9% hearing loss is related to occupational noise.

The WCJ made the following relevant findings regarding the medical testimony:

> 7. I have carefully reviewed the medical evidence presented in this matter and find that the testimony of [Claimant's Expert] is more credible than the testimony of [Employer's Expert]. [Claimant's Expert's] testimony is supported by Claimant's audiometric test results and is consistent with Claimant's credible testimony regarding the progression of his hearing loss. [Claimant's Expert] credibly testified that Claimant did not have hearing loss

---

**(continued…)**

> A. What I found was that he had a bilateral moderate low frequency sensory hearing loss that dropped to severe high frequency loss. His discrimination was 100 percent in both ears at loud conversation level.
>
> What that means is that the audiologist will give him a word and he has to repeat it and he was able to repeat 100 percent of those words. This was delivered at a loud conversation level, not a shouting level but a loud level and this is in a soundproof booth.
>
> I was able to calculate his binaural hearing handicap pursuant to the AMA Guidelines, and that was 20.9 percent.
>
> Q. And Doctor, how did that compare to his handicap at the time he retired in October of 2011?
>
> A. It was up significantly. His handicap in 2011 was 13.1 percent and this represents almost 100 percent increase. And this is attributable to the fact that he had an increase in those frequencies[,] in the low frequencies[,] that are used to compute the AMA Guideline formula.

R.R. at 9a-10a.

upon beginning work with [Employer] in 1977, that Claimant's tests did show a work-related notch in 1986, and that such notching disappears over time as hearing loss progresses at other frequencies. [Claimant's Expert] also credibly explained that hearing loss continues after the first 10 to 15 years of exposure, although at a lower rate of progression. [Employer's Expert's] testimony is less credible, given that he agreed that Claimant was working in an environment with hazardous noise as defined by OSHA,[5] and that he could not demonstrate any hearing impairment at or prior to the time of Claimant's employment [with Employer].

8. On the basis of the evidence accepted above, I find that as of January 17, 2012, Claimant has sustained a permanent hearing loss caused by long term exposure to hazardous occupational noise while working for Employer. I find that Claimant had no hearing impairment from non-occupational causes established at or prior to the time of employment with Employer. I find that Claimant[] has sustained a 20.9 percent binaural hearing loss as determined by audiogram testing which conformed to OSHA standards.

F.F. Nos. 7-8. Based on these findings, the WCJ concluded Claimant met his burden of establishing a permanent occupational hearing loss under Section 306(8)(c) of the Act and awarded specific loss benefits of $888.00 per week for 54.34 weeks (20.9% x 260 weeks). Id. at 9, 10.

On appeal to the Board, Employer did not contest the WCJ's grant of Claimant's claim petition. Rather, Employer argued the WCJ's determination that Claimant suffered a 20.9% binaural hearing loss was not supported by substantial evidence because the WCJ found Claimant's Expert's testimony credible and

---

[5] The Occupational Health and Safety Administration is an agency of the U.S. Department of Labor.

9

rejected Employer's Expert's testimony as not credible, and Claimant's Expert testified Claimant only suffered an 11.3% work-related hearing loss.

Ultimately, the Board modified the calculation of Claimant's specific loss benefits from those for a 20.9% binaural hearing loss to those for an 11.3% binaural hearing loss. In so doing, the Board explained (with emphasis added):

> [T]he WCJ accepted the opinion of [Claimant's Expert] in its entirety and he opined that Claimant sustained a work-related hearing loss and he could attest to his audiogram testing result, resulting in an 11.3% impairment, to a reasonable degree of medical certainty. While he indicated that [Employer's Expert's] audiogram was appropriately performed and he did not disagree with it, he did not adopt the opinion as his own. The WCJ rejected [Employer's Expert's] testimony in its entirety and did not parse out an exception for [Employer's Expert's] test results. In short, there is no credible medical opinion establishing that Claimant sustained a 20.9% work-related hearing impairment. As such, we will modify the Decision and Order to reflect that, consistent with the credible testimony of [Claimant's Expert], Claimant sustained an 11.3% work-related hearing loss. Benefits are to be calculated consistent with that determination.

Bd. Op., 10/7/15, at 8-9.

On appeal here, Claimant contends the Board erred in modifying the WCJ's calculation of his specific loss benefits because the WCJ accepted as credible Claimant's Expert's testimony regarding the work-relatedness of Claimant's hearing loss, but accepted as credible Employer's Expert's testimony regarding the percentage of hearing loss based on an audiogram that conformed to

10

OSHA standards.[6]  Therefore, Claimant argues, there is substantial competent medical evidence supporting the WCJ's determination that Claimant suffered a work-related 20.9% binaural hearing loss.

Further, Claimant asserts two separate facts exist.  First, the WCJ found, based on Claimant's Expert's testimony, that Claimant's exposure to occupational noise caused his hearing loss.  F.F Nos. 7, 8.  Second, with respect to the extent of Claimant's hearing loss, Claimant stressed that neither expert's audiogram addressed the work-relatedness of the loss.  Rather, the expert's separate opinions establish the work-relatedness of the hearing loss.

Claimant also asserts the Board erred in determining the WCJ accepted Claimant's Expert's testimony in its entirety and rejected Employer's Expert's testimony in its entirety.  Rather, Claimant argues, the WCJ found Employer's Expert less credible as to causation.

To begin our analysis, we recognize that in a workers' compensation proceeding, the WCJ is the ultimate finder of fact.  Hayden v. Workmen's Comp. Appeal Bd. (Wheeling Pittsburgh Steel Corp.), 479 A.2d 631 (Pa. Cmwlth. 1984).  As the ultimate fact-finder, the WCJ is entitled to accept or reject the testimony of any witness, including a medical witness, in whole or in part.  Wheeling–Pittsburgh Steel Corp. v. Workers' Comp. Appeal Bd. (Sesco), 828 A.2d 1189,

---

[6] This Court's review is limited to determining whether there was a violation of constitutional rights, errors of law committed, or a violation of appeal board procedures, and whether necessary findings of fact were supported by substantial evidence.  Lehigh County Vo-Tech School v. Workmen's Comp. Appeal Bd. (Wolfe), 652 A.2d 797 (Pa. 1995).

11

1193 (Pa. Cmwlth. 2003). In a case involving a claim for specific loss benefits based on work-related binaural hearing loss, it is within the WCJ's prerogative to accept the opinion of one physician as to the causal relationship between a claimant's hearing loss and his occupational noise exposure and to accept the opinion of another physician as to the percentage of hearing impairment. Helvetia Coal Co. v. Workers' Comp. Appeal Bd. (Learn), 913 A.2d 326 (Pa. Cmwlth. 2006).

Section 308(c)(8)(iv) of the Act states that "[t]he percentage of hearing impairment for which compensation may be payable shall be established solely by audiogram," and "[t]he audiometric testing must conform to OSHA Occupational Standards . . . ." 77 P.S. §513(c)(8)(iv). In Sesco, we determined the WCJ did not err in rejecting an employer's pre-employment audiogram that did not meet OSHA standards "[b]ecause the Act requires that the WCJ consider only those audiograms that meet OSHA standards when determining whether [a c]laimant sustained a hearing loss due to exposure to hazardous occupational noise . . . ." Sesco, 828 A.2d at 1194.

With respect to Finding of Fact No. 7, we agree with Claimant that the Board erred in determining the WCJ rejected Employer's Expert's testimony in its entirety. Rather, the WCJ found Employer's Expert's testimony less credible as to causation. In particular, the WCJ found: "[Employer's Expert's] testimony is less credible, given that he agreed that Claimant was working in an environment with hazardous noise as defined by OSHA, and that he could not demonstrate any hearing impairment at or prior to the time of Claimant's employment [with

12

Employer]." F.F. No. 7 (emphasis added). As we recognized in <u>Helvetia Coal Co.</u>, it is within the WCJ's prerogative in a hearing loss case to accept the claimant's medical expert's opinion as to causation and to accept the result of the audiogram conducted by the employer's medical expert.

In Finding of Fact No. 8, the WCJ found Claimant "sustained a 20.9% binaural hearing loss as determined by audiogram testing which conformed to OSHA standards." WCJ Op., F.F. No. 8. As noted above, Claimant's Expert testified he did not disagree with Employer's Expert's finding of a 20% binaural hearing loss. R.R. at 5a-6a. Nevertheless, Claimant's Expert could not testify from personal knowledge about another expert's testing procedures, and he could not supply the foundation testimony that the Employer's Expert's test was OSHA-compliant. Instead, Claimant's Expert merely repeated statements made by Employer's Expert regarding how the test was conducted. <u>See</u> R.R. at 8a.

Pursuant to Section 306(8)(i) of the Act, compensation for permanent binaural hearing loss caused by long-term exposure to hazardous occupational noise is determined by multiplying the percentage of hearing loss as calculated under the AMA's Impairment Guides by 260 weeks. 77 P.S. §513(8)(i). Compensation is payable at 66 2/3% of wages during this number of weeks. <u>Id.</u> Although the WCJ explained here that he found Claimant's Expert more credible as to causation, he did not distinctly explain why he found Claimant's Expert less credible as to the percentage of Claimant's hearing loss.

Consequently, we conclude we must remand this case in order for the WCJ to render more detailed findings, based on the existing record, as to whether he accepted Employer's Expert's testimony (that Claimant suffered a 20.9% hearing loss) as more credible than Claimant's Expert's testimony (that Claimant suffered an 11.3% hearing loss). In so doing, we ask the WCJ to clearly identify his reasons for reaching his determinations as the actual percentage of Claimant's hearing loss. A remand to the WCJ is appropriate where a factual issue needs to be resolved and can be easily rectified by making additional findings. Trudnak v. Workmen's Comp Appeal Board (Lucky Strike Coal Co.), 629 A.2d 254 (Pa. Cmwlth. 1993).

For these reasons, we vacate the order of the Board and remand with instructions for a further remand to the WCJ for further proceedings consistent with this opinion.

_____
ROBERT SIMPSON, Judge

14

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Steven Paolucci,                     :
                    Petitioner     :
                                     :
           v.                    :    No. 2075 C.D. 2015
                                     :
Workers' Compensation Appeal    :
Board (Exelon Generation         :
Company, LLC),                :
                    Respondent   :

## O R D E R

**AND NOW**, this 16th day of September, 2016, the order of the Workers' Compensation Appeal Board is **VACATED** and this case is **REMANDED** with instructions for a further remand to the Workers' Compensation Judge for further proceedings consistent with the foregoing opinion. Jurisdiction is relinquished.

                                        _____
                                        ROBERT SIMPSON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Steven Paolucci, : 
         : No. 2075 C.D. 2015
                Petitioner : Submitted: March 11, 2016
         :
             v. :
         :
Workers' Compensation Appeal : 
Board (Exelon Generation : 
Company, LLC), :
         :
             Respondent :


BEFORE:    HONORABLE ROBERT SIMPSON, Judge
                 HONORABLE MICHAEL H. WOJCIK, Judge
                 HONORABLE DAN PELLEGRINI, Senior Judge


CONCURRING AND DISSENTING OPINION
BY JUDGE WOJCIK                 FILED:  September 16, 2016


       Although I agree with the majority's determination that the Workers' Compensation Appeal Board's (Board) order should be reversed, I do not agree that the matter should be remanded to the Workers' Compensation Judge (WCJ) to make additional findings of fact. Rather, I believe that the WCJ has already made sufficient findings to support the award of benefits and for this Court to conduct effective appellate review in this case.[1]

---

[1] Section 422(a) of the Workers' Compensation Act (Act), Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §834, states, in relevant part, that "[a]ll parties to an adjudicatory proceeding are entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely explains the rationale for the decisions . . . ."

As the majority acknowledges, in a case involving a claim for specific loss benefits due to work-related binaural hearing loss, the WCJ has the prerogative to accept the opinion of one physician as to the causal relationship between a claimant's hearing loss and his occupational noise exposure and to accept the opinion of another physician as to the percentage of hearing impairment. *Helvetia Coal Company v. Workers' Compensation Appeal Board (Learn)*, 913 A.2d 326, 330 (Pa. Cmwlth. 2006). Additionally, the majority correctly notes that in *Wheeling–Pittsburgh Steel Corporation v. Workers' Compensation Appeal Board (Sesco)*, 828 A.2d 1189, 1192 n.3 (Pa. Cmwlth. 2003), *appeal denied*, 864 A.2d 531 (Pa. 2004), this Court explained that a WCJ did not err in rejecting an employer's pre-employment audiogram which did not meet OSHA standards "[b]ecause the Act[2] requires that the WCJ consider only those audiograms that meet OSHA standards when determining whether Claimant sustained a hearing loss due to exposure to hazardous occupational noise . . . ."

In this case, the only audiogram that the WCJ found conforms to OSHA standards as required by Section 308(c)(8)(iv) of the Act is that conducted by Employer's expert, Dr. Rowe, and it shows that Claimant suffers from a 20.9% hearing loss. WCJ 1/29/14 Decision at 9. There is no finding that the audiogram conducted by Claimant's expert, Dr. Ladenheim, indicating that Claimant suffers from an 11.3% hearing loss, conforms to those standards. As a result, the WCJ was not required to consider the results of Dr. Ladenheim's audiogram because it is not competent evidence in determining whether Claimant sustained a

---

2 Section 308(c)(8)(iv) of the Act, 77 P.S. §513(c)(8)(iv), states that "[t]he percentage of hearing impairment for which compensation may be payable shall be established solely by audiogram," and "[t]he audiometric testing must conform to OSHA Occupational Standards . . . ."

compensable hearing loss under Section 308(c)(8)(iv). *Sesco*. The WCJ properly accepted as credible the results of Dr. Rowe's audiogram which meets OSHA standards and shows that Claimant has a 20.9% binaural hearing impairment. *Helvetia Coal Company*.

Moreover, there is substantial record evidence supporting the WCJ's findings. Dr. Ladenheim explained that "[i]n reading Dr. Rowe's report, he states that this was done by a certified audiologist, it was done within the boundaries of an approved booth, so I can certainly say that his audiogram was accurate;" Dr. Ladenheim did "not disagree with [Dr. Rowe's] conclusion" that Claimant had a 20.9% hearing loss; and Dr. Rowe's audiogram "is of the same configuration that was done in my office, and the difference in percent of hearing loss from all three audiograms may be attributed to what we refer to as test-to-test variability." Reproduced Record at 6a, 8a. Likewise, Dr. Rowe explained that he "had audiometric testing performed by a board certified audiologist under [his] direction which was in a sound dampened and calibrated booth pursuant to OSHA and ANSI specifications," and that he calculated Claimant's "binaural hearing handicap pursuant to the AMA Guidelines, and that was 20.9 percent." *Id.* at 9a, 10a.

Consequently, the WCJ acted within his authority when he found that Claimant suffered a hearing loss of 20.9%, and the Board clearly erred in modifying the WCJ's decision and directing the calculation of Claimant's benefits based upon the results of an audiogram that is not competent under Section 308(c)(8)(iv). Furthermore, the WCJ was not required to explain why he did not consider or accept as credible the incompetent results of Dr. Ladenheim's audiogram. *Sesco*; *see also Acme Markets, Inc. v. Workers' Compensation Appeal Board (Brown)*, 890 A.2d 21, 26 (Pa. Cmwlth. 2006) ("A decision is 'reasoned' for

purposes of Section 422 if it allows for adequate review by this Court under applicable review standards . . . . A reasoned decision does not require the WCJ to give a line-by-line analysis of each statement by each witness, explaining how a particular statement affected the ultimate decision.") (citation omitted).[3]

Accordingly, unlike the majority, I would reverse the Board's order and reinstate the WCJ's decision.

_____
MICHAEL H. WOJCIK, Judge

---

[3] The majority's reliance on *Trudnak v. Workmen's Compensation Appeal Board (Lucky Strike Coal Co.)*, 629 A.2d 254, 255-56 (Pa. Cmwlth. 1993) to support remand is misplaced because in that case:

> [T]he first [WCJ]'s findings of fact were not specific enough to meet the standards of appellate review. In fact, the referee did not even summarize the evidence. He failed to discuss any of the medical testimony and made no credibility determinations. Aside from possible inferences from the result, the Board was unable to determine what evidence the [WCJ] accepted and what evidence he rejected in reaching the conclusion that Claimant was eligible for benefits.

As outlined above, the WCJ's findings of fact in this case are sufficiently specific to support the award of benefits and to conduct appellate review. The WCJ properly accepted as credible Dr. Ladenheim's opinion that Claimant's hearing impairment is work-related; properly rejected as not credible Dr. Rowe's contrary opinion regarding causation; and properly accepted as credible the only competent results of an audiogram which shows that Claimant has a 20.9% binaural hearing impairment. *Helvetia Coal Company*.